# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 19, 2013

No. 12-50836

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

NASER JASON JAMAL ABDO, also known as Naser Jason Abdo,

Defendant-Appellant

Appeals from the United States District Court
for the Western District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

REAVLEY, Circuit Judge:

Naser Jason Jamal Abdo was arrested by police before he could carry out a plan to detonate a bomb and shoot service members stationed at Fort Hood, Texas. He was convicted of one count of attempted use of a weapon of mass destruction (Count 1), one count of attempted murder of officers or employees of the United States (Count 2), and four counts of possession of a weapon in furtherance of a federal crime of violence (Counts 3–6). He appeals his conviction and sentence. We AFFIRM.

I.

On July 26, 2011, Greg Ebert, an employee in a gun store in Killeen, Texas, notified police Sgt. Bradley and Lt. Boone about a suspicious customer

who had come into the store. The customer, later identified as Abdo, purchased six one-pound containers of different types of smokeless gunpowder despite an apparent lack of knowledge about the substance, as well as three boxes of shotgun shells and an extended magazine for a handgun. Abdo's purchases were suspicious because smokeless gunpowder, which is normally used to re-load ammunition, is typically purchased in one to two pound quantities of the same type along with other supplies, such as bullets or primers. Abdo purchased six pounds of different types of powder and no bullets or primers. He paid cash, left in a hurry, and did not take his change or receipt.

The day after Ebert's tip, Sgt. Bradley learned that the same customer from the gun store had also gone to an army/navy surplus store and asked for an army combat uniform, a name patch bearing the name "Smith," and patches of the kind used at Fort Hood. Sgt. Bradley became concerned that the customer may have been planning an attack on Fort Hood or on the city. Bradley had previously served as an advisor to the National Police in Afghanistan and knew that the gunpowder could be used to construct improvised explosive devices (IEDs). He also had seen terrorists use bogus uniforms to infiltrate their intended targets.

Upon learning that the customer had taken a cab to a hotel, Sgt. Bradley, Lt. Boone, and an army investigator, all in plain clothes, went to the hotel along with two uniformed police officers. As they were examining guest records, Bradley and Boone saw a taxicab arrive and then saw Abdo approach the cab wearing a large, overstuffed backpack. Abdo matched perfectly the description of the customer from the gun store. Because the police knew Abdo had purchased items associated with firearms and explosives, they believed he might have had weapons or explosives in the backpack. Bradley had seen pipe bombs and other portable IEDs concealed in backpacks while in Afghanistan.

No. 12-50836

Lt. Boone drew his weapon and ordered Abdo to stop. Although Abdo initially put his hands up, he began to lower them, and Sgt. Bradley believed from Abdo's look that he was considering whether to engage the police or attempt to flee. Sgt. Bradley drew his own weapon and ordered Abdo not to touch anything. Abdo was placed on the ground, separated from the backpack, and placed in handcuffs by a uniformed officer. He was also placed inside an air conditioned police car. A Tennessee identification card bearing the name Asher Pluto was found in his pocket.

After being informed of his *Miranda* rights, Abdo admitted that he was an AWOL soldier from Fort Campbell, Kentucky, and was planning to attack soldiers at Fort Hood. Approximately fifteen minutes into the stop, police also learned from dispatch that there were outstanding warrants for Abdo. Abdo was then formally arrested and transported to the jail. Inside the backpack, police found a Springfield Armory .40 caliber pistol, a magazine, two clocks, wiring, batteries, and other materials that could be used in the construction of an explosive device. They also found an article entitled "How to Build a Bomb in the Kitchen of Your Mom." A subsequent search of Abdo's hotel room pursuant to a warrant revealed multiple items that could be used to make an explosive device, including the smokeless gunpowder and two pressure cookers, as well as the United States Army uniform that Abdo had purchased.

II.

Abdo first contends that the district court erroneously denied his motion to suppress the evidence found at the time of his arrest and statements that he made to police. He contends that his detention at gunpoint and placement in a police car in handcuffs was a full arrest, rather than an investigatory stop, that was unsupported by probable cause and was thus unlawful.

"When the district court denies a motion to suppress, we review factual findings for clear error and conclusions of law *de novo*." *United States v.*

3

No. 12-50836

*Rodriguez*, 702 F.3d 206, 208 (5th Cir. 2012) (internal quotation and citation omitted). We view the evidence in the light most favorable to the prevailing party, here the Government. *Id.*

Police may detain a suspect and briefly investigate when they have reasonable suspicion, based on specific and articulable facts and rational inferences, that justifies the intrusion. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968). This standard is less stringent than the probable cause standard required for a full arrest. *See United States v. Sanders*, 994 F.2d 200, 203 (5th Cir. 1993). "Whether a detention is an arrest or merely a *Terry*-stop depends on the 'reasonableness' of the intrusion under all the facts." *United States v. Martinez*, 808 F.2d 1050, 1053 (5th Cir. 1987). We conclude that, under all the circumstances present in this case, the police had reasonable suspicion to believe that Abdo was armed and dangerous and that the police effected a lawful investigative detention.

Abdo contends that he was placed under arrest from the inception of the stop because he was detained at gunpoint and placed handcuffed into a police car. We have held, however, that "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *Sanders*, 994 F.2d at 206. The police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect. *See Terry*, 392 U.S. at 30, 88 S. Ct. at 1884 (holding that if police have reasonable grounds to believe a suspect is "armed and dangerous," they may take "swift measures to discover the true facts and neutralize the threat of harm"); *see also United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675, 683–84 (1985) (holding that officers were "authorized to take such steps as were

No. 12-50836

reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop").

The police here reasonably believed that Abdo was armed and dangerous. They knew he had purchased multiple items related to firearms, as well as a large amount of gunpowder in a manner that was inconsistent with its normal use. They knew he had acted suspiciously in the gun store (e.g., he never removed his sunglasses and made questionable comments to the store employee). The police also knew Abdo had then purchased an army uniform and expressly asked for the kind of patches used at Fort Hood, which suggested he lacked the knowledge that a newly arriving soldier would have and thus did not belong. At the time of the encounter, Abdo was carrying a large, overstuffed backpack on a very hot day. Sergeant Bradley had experience with terrorists using similar tactics of concealing explosives in backpacks and obtaining fake uniforms to facilitate an attack. Under these circumstances, the police acted with reasonable care in drawing their weapons and handcuffing Abdo. *See United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) ("When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons." (internal quotation marks and citation omitted)). Placing Abdo inside the air conditioned police car rather than leaving him lying on the ground did not significantly increase the intrusiveness of the stop and transform the detention into an arrest. *See, e.g., Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004) (holding that ordering suspect out of car at gunpoint, handcuffing him, and placing him in police car did not elevate *Terry* stop to an arrest where police had information suspect could be armed). Furthermore, the detention lasted only about fifteen minutes before police learned that there were outstanding warrants for Abdo. *See Campbell*, 178 F.3d at 350 (holding that detention of suspect for 25 minutes was not unreasonable for an investigatory stop).

No. 12-50836

We hold that under all the circumstances the stop was a proper investigatory detention and was supported by reasonable suspicion. *See Terry*, 392 U.S. at 22, 88 S. Ct. at 1880–81 (holding that even a series of acts which appear innocent if taken separately may, when taken together, warrant further investigation). The district court did not err in denying the suppression motion.

III.

Abdo next challenges his convictions on Counts 3 and 5 of the superseding indictment for possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Count 3 of the indictment charged Abdo with possession of a Springfield Armory .40 caliber pistol in furtherance of the crime of attempted use of a weapon of mass destruction, while Count 5 charged him with possession of the same firearm in furtherance of the crime of attempted murder of officers or employees of the United States. Abdo argues that one of these counts must be vacated because § 924(c)(1) does not permit multiple convictions for a single use of a firearm based on multiple predicate offenses. He contends that he was improperly convicted for two offenses based on "attempting to use a single pistol on a single occasion."[1]

Because Abdo did not raise this issue in the district court, our review is limited to plain error. *See Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 1429 (2009). Under plain error review, the appellant must show (1) an error, (2) that is clear and obvious, and (3) that affected his substantial rights. *United States v. Zelaya-Rosales*, 707 F.3d 542, 544 (5th Cir. 2013). If the appellant makes this showing, this court will exercise its "discretion to correct

---

[1] Contrary to Abdo's argument, we note that Abdo was charged with *possession* of a weapon in furtherance of a crime of violence, not *use* of the weapon during and in relation to a crime of violence. *See United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013) ("18 U.S.C. § 924(c)(1)(A) proscribes two different types of conduct: the use or carrying of a firearm 'during and in relation to any crime of violence or drug trafficking crime' and the possession of a firearm 'in furtherance of any such crime.'" (quoting § 924(c)(1)(A)).

No. 12-50836

the error only if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 544–45 (internal quotation and citation omitted).

Abdo is correct that we have held that "§ 924(c)(1) does not unambiguously authorize multiple convictions for a single use of a single firearm based on multiple predicate offenses." *United States v. Phipps*, 319 F.3d 177, 189 (5th Cir. 2003). In *Phipps*, the defendants had abducted a woman at gunpoint and then immediately gave the gun to an accomplice before driving away with the woman in her car. *Id.* at 180. We held that the defendants could not be convicted for both using the firearm during and relation to carjacking and using the same firearm during and in relation to the simultaneous offense of kidnaping where the defendants used the gun for a dual criminal purpose and then immediately discarded the weapon. *Id.* at 189; *see also United States v. Walters*, 351 F.3d 159, 173 (5th Cir. 2003) (holding that a single delivery of a single bomb did not support two convictions under § 924(c)(1) for using a destructive device during and in relation to two crimes of violence, one for assaulting a federal officer and one for damaging a federal building where the bomb was opened).

We agree with the Government that *Phipps* does not control the case here because Abdo was not convicted of possessing the firearm on a single occasion in furtherance of simultaneous dual criminal purposes. Abdo admitted to police that he intended to detonate a bomb at a restaurant and then shoot any surviving soldiers. His possession of the firearm for the purpose of shooting the soldiers was therefore in furtherance of the offense of attempted murder of officers or employees of the United States, as charged in Count 5. But Abdo also admitted to police that on the day of his arrest, when he was in possession of the firearm in the backpack, he intended to conduct reconnaissance in advance of carrying out the attack. The trial testimony further showed that Abdo also possessed the backpack, in which he stored the firearm, on the day before his

7

No. 12-50836

arrest when he purchased not only several component parts to be used in the explosive device but also the army uniform that would allow him to blend in.  As the Government argued at trial, the jury could infer that Abdo possessed the firearm for personal protection while he took steps toward the construction and placement of a bomb.  This was a separate and distinct possession of the firearm, which furthered the distinct offense of attempted use of a weapon of mass destruction, as charged in Count 3.

In *Phipps*, we noted that a defendant's separate use or possession of firearms in conjunction with distinct offenses might support multiple convictions. *See Phipps*, 319 F.3d at 188–89 ("Had, for example, [the defendants] kept the firearm and used it to restrain or intimidate [the victim] later, we might have affirmed their multiple convictions.  We also might have done so if defendants had used, carried, or possessed multiple firearms when they took [the victim's] car and kidnaped her.").  In the instant case, the evidence at trial allowed the inference that Abdo kept possession of the firearm for distinct purposes and to further distinct offenses, namely to shoot his intended victims and to provide protection for himself while he carried out his plans to detonate a bomb.  Because the evidence allowed for the inference of two different possessions and purposes for the firearm, there is no clear or obvious error in Abdo's conviction for multiple offenses.  Under plain error review, we therefore reject Abdo's argument.

## IV.

Finally, Abdo argues that he was denied his right to present a defense because the district court denied his request for funds for an expert witness. We are unpersuaded.  Abdo does not articulate in his brief the defense that he wished his expert to present but rather cites to the transcript where his counsel made a proffer to the district court.  An appellant may not incorporate by reference issues and arguments raised in the district court. *United States v.*

No. 12-50836

*Jackson*, 549 F.3d 963, 972 n.6 (5th Cir. 2008).  The issue is therefore waived. *See id.*

Moreover, even if the issue were not waived, it fails on the merits.  We note that the district court did not deny Abdo all access to expert assistance. Rather, the court granted Abdo $3500 to consult with an expert, but it denied a request for additional funds shortly before trial because the expert, who lived far away, required an exceedingly high fee to appear to testify.  In any event, defense counsel's proffer showed that Abdo wished to have the expert testify that a bomb made with the materials found in Abdo's backpack and hotel room would not be capable of causing much damage.  The evidence at trial showed, however, that an explosive device could have been constructed from the materials. Because Abdo was charged with an attempt offense, this was sufficient, and the actual damage that could have been caused is irrelevant.  *See United States v. Crow*, 164 F.3d 229, 235 (5th Cir. 1999) (stating that "factual impossibility is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be" (internal quotation marks and citation omitted)).  The expert's testimony therefore would not have materially assisted the defense.  *See Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (holding that an indigent defendant requesting non-psychiatric experts must show "a reasonable probability that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial").  The denial of the additional funds did not result in an unfair trial, and we perceive no error.

AFFIRMED.